UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Terry Rasmussen,

   Plaintiff,

v.                Civil No. 07-1730 (JNE/SRN)
                   ORDER
Jerry's Enterprises, Inc.,

   Defendant.

---

Duane Arndt, Esq., Arndt & Benton, P.A., appeared for Plaintiff Terry Rasmussen.

Holly S.A. Eng, Esq., and Joel O'Malley, Esq., Dorsey & Whitney LLP, appeared for Defendant Jerry's Enterprises, Inc.

---

   Terry Rasmussen brought this action against Jerry's Enterprises, Inc. (JEI) in Minnesota's Fourth Judicial District alleging violations of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654 (2000), *amended by* Pub. L. 110-181, Title V, § 585(a)(2), (3)(A)-(D), 122 Stat. 129 (2008), and the Minnesota Human Rights Act (MHRA), Minn. Stat. §§ 363A.01-.41 (2006). JEI removed the action to this Court and brought a counterclaim for negligence. The case is before the Court on JEI's motion for an order of summary judgment dismissing Rasmussen's FMLA and MHRA claims and granting JEI's negligence counterclaim. The Court heard oral argument on July 11, 2008. For the reasons set forth below, the Court grants JEI's motion as to Rasmussen's FMLA and MHRA claims and dismisses without prejudice JEI's negligence counterclaim.

**I. BACKGROUND**

   JEI is a grocery retailer headquartered in Minneapolis, Minnesota. JEI operates Cub Foods stores in Minnesota, including the Cub Foods store located at the intersection of 60th

1

Street and Nicollet Avenue in Minneapolis (Cub Nicollet store).  Rasmussen began working at the Cub Nicollet store as a part-time employee on July 23, 1998.  In fall 2004, he became a full-time employee, which he remained until his termination on March 31, 2006.  Rasmussen worked in the meat department of the Cub Nicollet store.  His job included stocking and rotating the fresh meat in the display cases, operating the automatic meat wrapper, weighing and scaling meats, cleaning the kitchen, and assisting customers.

Rasmussen was a member of the United Food and Commercial Workers Union, District Local 653 – AFL-CIO (Union), throughout his employment.  An agreement between the Union and JEI governed the terms of Rasmussen's employment.  The agreement listed drunkenness and dishonesty as grounds for dismissal and referred to FMLA leave in a section covering leaves of absence.  The Employee Policies & Procedures Guide (employee handbook) for the Cub Nicollet store contained several paragraphs describing JEI's policies with respect to the FMLA.  The employee handbook also stated, "Excess absences and/or tardiness are subject to disciplinary procedures up to and including discharge."

On the day he was hired, Rasmussen signed an acknowledgement form indicating that he had received a copy of the employee handbook.  Rasmussen disputes whether he received a copy of the employee handbook.  He has no recollection of receiving it and states that he signed a number of papers "real quick" when hired, but never participated in any orientation.  The Cub Nicollet store also posted information about the FMLA near employee schedules.

Rasmussen is an alcoholic.  He was sober from 1995 until 2004, when he began drinking again. In February 2006, he began experiencing vomiting, diarrhea, abdominal pain, and

gastroenteritis,[1] as well as periods of cold and sweating. Rasmussen began "self-medicating" with alcohol to alleviate his symptoms. Rasmussen's self-medication entailed drinking between twelve and twenty-four cans of beer on days he was not working, and "something less" on days he was working.

From February 20 to March 31, 2006, Rasmussen missed twenty-two of twenty-nine scheduled workdays.[2] The Cub Nicollet store paid other employees overtime to cover Rasmussen's absences. Although he missed twenty-one days of work in March, Rasmussen shopped at the Cub Nicollet store three times per week throughout that month.

Rasmussen first missed work on February 20, 2006.[3] Although Rasmussen remembers calling in one day in February, he does not recall any details of the call. His scheduled start time was 2:00 p.m. Rasmussen called John Pappas, the meat department supervisor, at 3:10 p.m. and informed Pappas that he would not be in to work that day. Rasmussen called John Tonsager, the store manager, about fifteen minutes later to ask if Tonsager might consider hiring Rasmussen's brother. Both Pappas and Tonsager thought Rasmussen's speech sounded as if he had been drinking.

---

[1]  Gastroenteritis is "[i]nflammation of the mucous membrane of both stomach and intestine." Stedman's Medical Dictionary 732 (27th ed. 2000) [hereinafter Stedman's]. Viral gastroenteritis is "an epidemic, highly communicable but rather mild disease of sudden onset, caused by the epidemic gastroenteritis virus (especially Norwalk agent), with an incubation period of 16-48 hours and a duration of 1-2 days, which affects all age groups; infection is associated with some fever, abdominal cramps, nausea, vomiting, diarrhea, and headache, one or another of which may be predominant." *Id.*

[2]  Rasmussen used floating holidays, personal holidays, and vacation time to receive compensation for the first seventeen of his twenty-two absences. He received no compensation for his last five absences because he had used all of his holiday and vacation time.

[3]  It is unclear from the record whether it was Rasmussen or his roommate Denise Harris who called in Rasmussen's absences for most of the days he missed work. Unless otherwise indicated, a statement in this Order that Rasmussen "called in sick" means that the Cub Nicollet store received a call from either Rasmussen or Harris regarding Rasmussen's absence.

Rasmussen worked his next scheduled workdays of February 24-27 and March 3. On March 4, Rasmussen called in sick. On March 5, Rasmussen was scheduled to work from 1:00 p.m. to 9:00 p.m. Rasmussen visited the Abbott Northwestern Hospital emergency room shortly after 5:00 p.m. that day complaining of nausea, vomiting, and diarrhea for one week and left-sided weakness, numbness, and pain following a fall seven to ten days earlier. Rasmussen told the emergency room staff that he had been drinking more lately and stated in his deposition that he "probably" had been drinking on March 5. The discharge papers indicate that the emergency room physician diagnosed Rasmussen with disturbance of skin sensation, nausea with vomiting, diarrhea, viral gastroenteritis, and "alcohol intoxication acute, continuous." Rasmussen's discharge papers directed him to drink clear fluids in moderation, take painkillers, and avoid alcohol and tobacco. Rasmussen called Pappas after the hospital visit and informed Pappas that he had been in the hospital and was unable to work that day. Rasmussen told Pappas that he had lost significant weight and was suffering from nausea, diarrhea, and vomiting. Rasmussen did not mention the diagnosis of alcohol intoxication. Rasmussen told Pappas that Rasmussen's roommate Harris had also been ill.[4] Finally, Rasmussen told Pappas that he expected to miss a week of work.

Rasmussen was scheduled to work March 6-9, but called in sick each day. On March 10, Rasmussen was scheduled to work from 2:00 p.m. to 10:00 p.m. He spoke with Tonsager and Mona Velebir, a store assistant manager, shortly after arriving at the Cub Nicollet store. During that conversation, both Tonsager and Velebir smelled alcohol on Rasmussen's breath. Tonsager described Rasmussen as looking "very rough" and staggering. Rasmussen complained that his left arm was numb and held his arm during the conversation. Rasmussen stated he did not think

---

[4] Harris is a former Cub Nicollet store employee and known to Pappas.

4

he could work.  Tonsager instructed Rasmussen to go home and Rasmussen did so.  He did not work his next two scheduled days (March 11 and 12) and was not scheduled to work on March 13 and 14.

Rasmussen showed up for his scheduled shift on March 15.  On that day, he gave to Lesley Burk, the office manager, the discharge papers from his March 5 visit to the emergency room.  When giving Burk the discharge papers, Rasmussen told Burk that he was still suffering from vomiting, diarrhea, and weight loss.  He struggled with diarrhea during his shift and lost control of his bowels when lifting boxes.

Rasmussen called in sick again on March 16.  On March 17, Harris called in shortly before 1:00 p.m., approximately an hour after Rasmussen's scheduled start time, and told Burk that Rasmussen was in the hospital for observation.  Rasmussen did visit the Fairview Southdale Emergency Room on March 17, but not until about 9:30 p.m.  Rasmussen complained of vomiting, diarrhea, and weight loss, as well as left-sided facial and arm numbness.  Rasmussen admitted to drinking eight beers that day and had a blood alcohol level of 0.281 percent.  He was diagnosed as suffering from alcoholism.  The discharge papers indicated that Rasmussen's weight loss, vomiting, and diarrhea could well be secondary to his alcohol abuse and that there could be a concurrent viral-type syndrome.  The doctor prescribed suppositories for Rasmussen's nausea and told him that the first step in determining the cause of Rasmussen's symptoms was for him to stop drinking.  The doctor offered to place Rasmussen in a detoxification unit, but Rasmussen declined.  The doctor told Rasmussen that he should follow up with his primary care physician for further evaluation and treatment.

Rasmussen called in sick on March 18 and 19.  He did not show up for work on March 20, nor did he call in.  On Tuesday, March 21, Rasmussen called in sick and spoke with

5

Tonsager. According to notes taken by Tonsager during the call, Rasmussen said that the hospital had released him two days earlier and that he still had an IV in his arm. Both of these statements were false.[5] Rasmussen also told Tonsager that he had an unnamed virus, had lost twenty-three pounds, and was suffering from numbness on his left side. Rasmussen stated that he had an appointment scheduled with his primary care physician for the next day and that he might be in on Friday, but cautioned Tonsager that he should not expect him to be operating at 100 percent. Tonsager instructed Rasmussen to call in the next day and ask for either Pappas or Velebir. Tonsager described Rasmussen as "mumbling" and difficult to understand.

Rasmussen did not work his scheduled shift on March 22. Rasmussen testified during his deposition that he spoke with Tonsager in the meat department around March 22 and Tonsager told him he needed to provide a doctor's excuse before returning to work. Rasmussen was grocery shopping at the time. On March 24, Harris visited the Cub Nicollet store to deliver an insurance statement from Rasmussen's March 5 emergency room visit to Burk and purchase a twelve-pack of beer. Harris also spoke with Pappas that day and told him that Rasmussen had been in the hospital the previous day and had been diagnosed with a vitamin deficiency. Both of these statements were untrue. Harris stated that Rasmussen would have to miss work that night and the following day. Pappas told Harris that Rasmussen needed a note from his primary care physician excusing his absences. Pappas believed Harris smelled of alcohol and was under the influence. After Harris left, Tonsager instructed Burk to call Fairview Southdale to determine which room Rasmussen was in and when he had been discharged, but the hospital had no record of Rasmussen as a patient.

---

[5]     Rasmussen admits that he did not visit any hospital between March 18 and March 31. Further, Rasmussen's discharge papers indicate that while he did receive intravenous fluids during his hospital stay, the hospital removed his IV prior to his departure.

6

Rasmussen called in sick again on March 26. On March 27, Harris spoke on the phone with Scott Olson, a store assistant manager, and told him that Rasmussen had again visited the hospital and was discharged with an IV in his arm. Again, these statements were false. Tonsager also participated during the call via speakerphone, and at some point, Rasmussen spoke directly with Olson and Tonsager. Notes taken by Olson during the call indicate that Rasmussen sounded as if he had been drinking. Tonsager asked Rasmussen when he had been in the ER, but Rasmussen did not provide any dates. Tonsager informed Rasmussen that he needed a doctor's note to return to work and Rasmussen said he would see his doctor the next day.

Rasmussen cancelled his doctor's appointment scheduled for March 28 and rescheduled it for March 30. He missed work on March 29. At his March 30 appointment, Rasmussen complained of nausea and vomiting for the previous three weeks and told his primary care physician that he was drinking approximately twelve beers per day. His doctor described him as suffering from acute alcoholism and offered detoxification and rehabilitation, but Rasmussen declined treatment. At this appointment, Rasmussen's primary care physician gave Rasmussen an undated note stating: "To whom it may concern: Terry Rasmussen is unable to [r]eturn to work at this time. We are unable to give a return to work date at this time, as it is dependent on his health." Rasmussen missed work on March 31, the next day he was scheduled to work. JEI terminated Rasmussen that day via certified mail for "excessive absenteeism."

The parties dispute whether Rasmussen gave the doctor's note from his March 30 appointment to JEI before it terminated him. Rasmussen claims that he would have dropped the note off at the Cub Nicollet store immediately after visiting his doctor on March 30 because his house and his doctor's office are in close proximity to the Cub Nicollet store and he understood

7

that he needed to provide the note "right away."[6] Harris testified during her deposition that she delivered the note to the Cub Nicollet store the day before Rasmussen received his termination letter, which she thought was April 3. Harris also testified, however, that she probably would have delivered the note on the same day as Rasmussen's appointment if the appointment took place early enough in the day because Pappas told her he needed a new note. JEI claims Rasmussen received his termination letter on April 4 and that, based on Harris's deposition testimony, she delivered the note to the Cub Nicollet store on April 3. Puzzlingly, the delivery notices offered by JEI include a "Final Notice" dated April 7, suggesting that the Rasmussen did not receive the termination letter before that date. JEI also offers a combined photocopy of the note and an undated prescription for an anti-nausea medication including an annotation reading "Two notes from Terry's doctor. They are not dated but were written the same day. As per Terry 4/3/06" as evidence that Harris delivered the note on April 3.

Rasmussen received his termination letter in early April. He grieved his termination and the Union scheduled a mediation session, which Rasmussen cancelled because he wanted to have an attorney present.[7] Rasmussen failed to attend the second mediation session and asserted during his deposition that he never received notice of the second session. The Union closed the grievance after Rasmussen failed to attend the second mediation session.

---

[6] Rasmussen stated during his deposition that he visited his doctor on March 28 or 29 and dropped off the note on the same day. JEI suggests in its brief that Rasmussen did not drop off the doctor's note on March 30 because Rasmussen identified the wrong date for his doctor's appointment. Given that Rasmussen was originally scheduled to visit his doctor on March 28 and did visit his doctor on March 30, the Court does not believe Rasmussen's identification of the wrong date for his doctor's visit requires this conclusion.

[7] According to Rasmussen, he discovered after the cancelled mediation that he was not permitted to have a lawyer present at the mediation session.

8

In August 2006, Rasmussen's primary care physician described Rasmussen as suffering from "alcohol-related severe pancreatitis with secondary effects of dizziness, weakness, nausea, inability to take in fluids, and a 40 pound weight loss." Pancreatitis is inflammation of the pancreas. Stedman's 1302. One principal cause of pancreatitis is alcoholism. *Id.* Discharge papers from an August 6, 2006, visit to Abbott Northwestern Hospital describe Rasmussen's pancreatitis as "likely secondary to alcohol." In a December 20, 2006, letter to Rasmussen's counsel, Rasmussen's primary care physician stated "[i]t appears the initial inciting incident was a viral gastroenteritis, which Mr. Rasmussen self treated, using alcohol, which caused a further deterioration and onset of a disabling pancreatic/liver condition, which completely disabled him and was life-threatening." Rasmussen claimed in his deposition, however, that his primary care physician told him that alcohol did not necessarily cause the pancreatitis. Rasmussen's primary care physician authorized Rasmussen to return to work on a part-time basis on October 9, 2006, and as of December 20, 2006, he believed Rasmussen was able to work on a full-time basis without restrictions.

In November of 2007, Rasmussen drove over two parking signs in the Cub Nicollet store parking lot, resulting in Rasmussen's arrest for driving while intoxicated. JEI paid $819 to replace the two signs. That incident is the basis for JEI's negligence counterclaim.

## II.   DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its

9

burden, the nonmovant must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.     Rasmussen's FMLA Claim**

The FMLA allows eligible employees[8] a total of twelve weeks of leave during any twelve-month period for a variety of reasons, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. *Id.* § 2615(a)(1). To prevail on an interference claim, an "employee must show only that he or she was entitled to the benefit denied." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006).

Entitlement to FMLA leave requires the employee to give adequate notice of his need for FMLA leave and prove that he had a "serious health condition" as defined in the FMLA. *See Carter v. Ford Motor Co.*, 121 F.3d 1146, 1148 (8th Cir. 1997). The statute defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves . . . inpatient care in a hospital, hospice, or residential medical care facility [or] continuing treatment by a health care provider." 29 U.S.C. § 2611(11). "Continuing treatment by a health care provider" includes:

> (i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any

---

[8]     JEI does not dispute that it is covered by the FMLA or that Rasmussen is an eligible employee.

>subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
>>(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider . . . .

29 C.F.R. § 825.114(a)(2)(i)(A) (2006). "Treatment" includes "examinations to determine if a serious health condition exists and evaluations of the condition." *Id.* § 824.114(b).

Congress did not intend the FMLA to "cover leave for short-term conditions for which treatment and recovery are very brief." *Woods v. DaimlerChrysler, Inc.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotations omitted). Conditions not normally covered by the FMLA include "the common cold, the flu, ear aches, upset stomach, minor ulcers, [and] headaches other than migraine." 29 C.F.R. § 825.114(c). Although such ailments will not routinely satisfy the requirements of a serious health condition, absences resulting from such illnesses are protected under the FMLA when the regulatory test is met. *See Rankin v. Seagate Techs., Inc.*, 246 F.3d 1145, 1147 (8th Cir. 2001); *Thorson v. Gemini*, 205 F.3d 370, 379 (8th Cir. 2000). Substance abuse may qualify as a serious health condition, but FMLA leave is only available "for treatment for substance abuse." 29 C.F.R. § 825.114(d). "[A]bsence because of the employee's use of the substance, rather than for treatment, does not qualify for FMLA leave." *Id.*

JEI argues that Rasmussen was not entitled to FMLA leave because his absences were caused by drunkenness or hangovers rather than a serious health condition. In support of this argument, JEI offers medical evidence of Rasmussen's alcohol consumption and his testimony that he consumed twelve to twenty-four beers per day when not working, and "something less" on days he was working. Rasmussen counters with medical evidence showing pancreatitis caused his symptoms and therefore his absences. When taken in the light most favorable to

11

Rasmussen, the evidence shows that his absences were initially caused by viral gastroenteritis, which degenerated into a pancreatic/liver condition as a result of Rasmussen's self-medication with alcohol. The most common type of viral gastroenteritis lasts between one and two days and is considered a "mild disease." *See* Stedman's 732. Viral gastroenteritis therefore normally would not qualify as a serious medical condition. *See* 29 C.F.R. § 825.114(c); *Woods*, 409 F.3d at 990.

Rasmussen makes no showing that his initial viral gastroenteritis was serious enough to require medical treatment and render him incapable of working for three consecutive days. On the contrary, Rasmussen's Complaint asserts that he "continued to report for work during his normal and usual hours after the initial onset of these symptoms." Further, Rasmussen put forth no medical evidence that his initial gastroenteritis rendered him incapable of performing his job. Without an assessment by a health care provider that Rasmussen's initial gastroenteritis incapacitated him, Rasmussen cannot create a genuine issue of material fact as to whether his initial gastroenteritis was a serious medical condition qualifying him for FMLA leave.

With respect to his subsequent pancreatitis, Rasmussen has put forth evidence showing his pancreatitis rendered him incapable of working for more than three days and that he received "continuing treatment by . . . a health care provider" within the period of incapacity. Despite this showing, however, Rasmussen has not raised a genuine issue of material fact as to whether he was entitled to FMLA leave because his pancreatitis was caused by his alcohol abuse, and absence because of alcohol abuse "does not qualify for FMLA leave." *See* 29 C.F.R. § 825.114(d); *Sloop v. ABTCO, Inc.*, 178 F.3d 1285, 1999 WL 280281, at *3 (4th Cir. May 6, 1999) (unpublished opinion) (per curiam) ("There is no evidence that Congress intended the FMLA to cover medical leave precipitated by substance abuse without regard for the personal

responsibility of the employee."); *Scobey v. Nucor Steel-Arkansas*, Civ. No. 06-78, 2008 WL 110849, at *5-6 (E.D. Ark. Jan. 7, 2008).

Rasmussen claimed in his deposition that his doctor told him that alcohol consumption did not cause his pancreatitis. The doctor's out of court statement about the cause of Rasmussen's pancreatitis, offered to show that Rasmussen was entitled to FMLA leave, is inadmissible hearsay that Rasmussen that cannot use to avoid summary judgment. Fed. R. Evid. 801(c); Fed. R. Civ. P. 56(e); *see Anda v. Wickes Furniture Co., Inc.*, 517 F.3d 526, 534 (8th Cir. 2008).

Even if Rasmussen's testimony were admissible, no reasonable jury could find that his alcohol abuse did not cause his pancreatitis. One of the principal causes of pancreatitis is alcoholism. *See* Stedman's 1302. It is undisputed that Rasmussen was consuming between twelve and twenty-four beers on days he was not working during the period in question. Letters authored by Rasmussen's primary care physician—the same doctor who purportedly told Rasmussen that his pancreatitis was not caused by alcohol consumption—describe his pancreatitis as "alcohol-related" and state that Rasmussen's self-treatment with alcohol "caused a further deterioration and onset of a disabling pancreatic/liver condition." The records from Rasmussen's March 17, 2006, emergency room visit state that Rasmussen's weight loss, vomiting, and diarrhea could well be secondary to Rasmussen's alcohol abuse. The discharge papers from Rasmussen's August 6, 2006, visit to Abbott Northwestern Hospital describe Rasmussen's pancreatitis as "likely secondary to alcohol." In the face of this overwhelming evidence that Rasmussen's alcohol abuse caused his pancreatitis, Rasmussen's deposition testimony, even if admissible, would be insufficient to create a genuine issue of material fact as to the cause of his pancreatitis. *See Shanklin v. Fitzgerald*, 397 F.3d 596, 603 (8th Cir. 2005);

*Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir. 1994). Rasmussen has failed to raise a genuine issue of material fact as to his entitlement to FMLA leave for his alcohol-induced pancreatitis and therefore cannot avoid summary judgment on his FMLA claim.

The Court need not address whether Rasmussen gave adequate notice of his need for leave to JEI because Rasmussen has failed to create a genuine issue of material fact regarding whether his viral gastroenteritis was a serious medical condition and whether he was entitled to leave for his alcohol-induced pancreatitis. *See Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998) (summary judgment proper if plaintiff fails to create a genuine issue of material fact as to any element of prima facie case). Similarly, the Court need not address JEI's contention that it would have terminated Rasmussen for his excessive absenteeism regardless of any alleged request for FMLA leave. *See id.*

**B.      Rasmussen's MHRA Claims**

**1.      Failure to Accommodate and Discrimination Claims**

Rasmussen claims that JEI violated the MHRA by failing to accommodate his alleged disability and discriminating against him because of his alleged disability. To avoid summary judgment, Rasmussen must demonstrate that a genuine issue of material fact exists as to each element of a claim's prima facie case. *See Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). To succeed on these claims, Rasmussen must show (1) he was disabled within the meaning of the MHRA, (2) he was qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability. *Id.* Rasmussen must also show that JEI knew of, and failed to reasonably accommodate, his disability to succeed on his failure to accommodate claim. Minn. Stat. § 363A.08, subd. 6; *see Kammueller*, 383 F.3d at 784. Claims of disability discrimination are analyzed under the three-part burden-shifting test set forth by the United States Supreme

14

Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Kammueller*, 383 F.3d at 784; *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 542 (Minn. 2001).

The MHRA provides that "[a] disabled person is any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Minn. Stat. § 363A.03, subd. 12. Given the parallel nature of the MHRA and the American with Disabilities Act, 42 U.S.C. §§ 12101-12213 (2000) (ADA), the Court will interpret the MHRA in a manner consistent with the ADA. *See, e.g.*, *Allen v. Bridgestone/Firestone, Inc.*, 81 F.3d 793, 796 (8th Cir. 1996); *Lindgren v. Harmon Glass Co.*, 489 N.W.2d 804, 808 (Minn. App. 1992). A disability must be permanent or long term, rather than temporary or transitory, to qualify a person for protection against discrimination. *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002); *Mellon v. Fed. Express Corp.*, 239 F.3d 954, 957 (8th Cir. 2001). The MHRA specifically excludes "any condition resulting from alcohol or drug abuse which prevents a person from performing the essential functions of the job in question or constitutes a direct threat to property or the safety of others" from its definition of disability. Minn. Stat. § 363A.03, subd. 36.

Rasmussen argues that he was disabled because he is an alcoholic. JEI argues that Rasmussen was not disabled within the meaning of the MHRA because his symptoms resulted from his alcohol abuse. When taken in the light most favorable to Rasmussen, the evidence shows that he initially suffered from viral gastroenteritis, which degenerated into pancreatitis as a result of his self-treatment with alcohol. Viral gastroenteritis, a "mild disease" of temporary duration, *see* Stedman's 732, does not qualify as a disability under the MHRA. Rasmussen's subsequent pancreatitis was a condition resulting from and a direct consequence of his alcohol

abuse. JEI argues that Rasmussen's symptoms resulting from his pancreatitis were conditions resulting from his on-going alcohol abuse that prevented him from performing essential functions of his job.

Regular and reliable attendance is an essential element of most jobs. *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 469 (8th Cir. 2007) ("We have consistently held that regular and reliable attendance is a necessary element of most jobs . . .") (internal quotations omitted); *Greer v. Emerson Elec. Co.*, 185 F.3d 917, 921-22 (8th Cir. 1999). Rasmussen's job, which included stocking and rotating the fresh meat in the display cases, operating the automatic meat wrapper, weighing and scaling meats, cleaning the kitchen, and assisting customers, unquestionably required his physical presence at the Cub Nicollet store. Rasmussen and his primary care physician agree that he was incapable of working throughout the month of March. Thus, Rasmussen's alcohol-related pancreatitis prevented him from performing the essential function of attendance during March 2006. The MHRA will not shield Rasmussen from the consequences of his alcohol abuse. *See Larson v. Koch Refining Co.*, 920 F. Supp. 1000, 1004-05 (D. Minn. 1996). Rasmussen cannot avoid summary judgment on his failure to accommodate and discrimination claims because he has failed to create a genuine issue of material fact as to whether he was disabled within the meaning of the MHRA.

### 2. Retaliation Claim

Rasmussen also claims retaliation under the MHRA. The MHRA prohibits an employer from engaging in reprisal against any person because that person opposed a practice forbidden by the MHRA or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the MHRA. Minn. Stat. § 363.03, subd. 7(1). To establish a prima facie case, Rasmussen must show: (1) he engaged in protected conduct; (2) a reasonable employee would have found the challenged retaliatory action materially adverse; and

(3) the materially adverse action was causally linked to the protected conduct. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 785 (8th Cir. 2007).

JEI argues that Rasmussen's retaliation claim is foreclosed because he was not a qualified person with a disability under the MHRA. On the contrary, Rasmussen could still pursue a retaliation claim if he requested an accommodation so long as he had a good faith belief that the requested accommodation was appropriate. *See Heisler v. Metro. Council*, 339 F.3d 622, 632 (8th Cir. 2003). Here, no evidence suggests that Rasmussen requested any accommodation for his alleged disability. Rasmussen argues in his brief that he requested a lifting accommodation, but the portions of deposition transcript he cites contain no evidence of such a request. Rasmussen's bare assertion that he requested a lifting accommodation does not create a genuine issue for trial. *See Lambert v. City of Dumas*, 187 F.3d 931, 934-35 (8th Cir. 1999). Further, arguments of counsel are not evidence and do not create issues of fact. *See Exeter Bancorporation, Inc. v. Kemper Secs. Group, Inc.*, 58 F.3d 1306, 1312 n.5 (8th Cir. 1995).

In response to an interrogatory asking for all instances of statutorily protected conduct forming the basis of Rasmussen's MHRA retaliation claim, Rasmussen stated: "I was disabled. Cub management at my store knew I was ill. I communicated I was ill, and in spite of this knowledge, Cub proceeded to fire me, rather than accommodate or give me a leave pursuant to FMLA." Notably absent from this response is any mention of a request for an accommodation. *See Miller v. Nat'l Cas. Co.*, 61 F.3d 627, 630 (8th Cir. 1995) ("it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed"). Further, Rasmussen stated both in an interrogatory response and in his deposition that he did not request leave. Instead, Rasmussen called in sick on a daily basis and repeatedly told JEI that his absence

would be of a short duration.  Rasmussen has failed to create a genuine issue of material fact as to whether he engaged in statutorily protected conduct under the MHRA, and therefore cannot avoid summary judgment on his retaliation claim.

**C.     JEI's Negligence Counterclaim**

JEI seeks summary judgment on its state law negligence counterclaim arising from the November 2007 incident where Rasmussen drove over two parking signs in the Cub Nicollet store parking lot.  JEI asserts 28 U.S.C. § 1367 as the jurisdictional basis for this counterclaim.  This section provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).  Claims are part of the same case or controversy for purposes of section 1367 if they "derive from a common nucleus of operative fact." *See Myers v. Richland County*, 429 F.3d 740, 746 (8th Cir. 2005).  When determining whether there is a "common nucleus of operative fact," the Court is guided by the approach set forth in *Hunt v. Up North Plastics, Inc.*, , which requires, at a minimum, a discernable overlap between the operative facts underlying the federal claims and those underlying the appended state claims.  980 F. Supp. 1042, 1044-45 (D. Minn. 1997).  JEI, as the party asserting supplemental jurisdiction, bears the burden of establishing that supplemental jurisdiction exists.  *See 4:20 Commc'ns, Inc. v. Paradigm Co.*, 336 F.3d 775, 779 (8th Cir. 2003).

JEI has failed to establish a discernable overlap between the operative facts underlying Rasmussen's FMLA claim and the facts underlying JEI's negligence claim.  The facts relevant to Rasmussen's FMLA interference claim include Rasmussen's use of alcohol in February and

March 2006, its effect on Rasmussen's health, whether Rasmussen was incapacitated during that period, and the exchanges between Rasmussen and JEI relating to his absences. Rasmussen's condition and conduct on November 5, 2007—nineteen months after JEI terminated Rasmussen—are the facts relevant to JEI's negligence counterclaim. There is no discernable overlap between these facts. The Court lacks supplemental jurisdiction over JEI's negligence counterclaim.

### III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. JEI's Motion for Summary Judgment [Docket No. 14] is GRANTED as to Rasmussen's FMLA and MHRA claims.

2. Rasmussen's Complaint [Docket No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

3. JEI's Counterclaim [Docket Nos. 12, 13] is DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  September 2, 2008

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge